UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

—————————————————

KIRK ASHTON,                                        **DECISION AND ORDER**

                    Petitioner,

        v.                                          6:25-CV-06156 EAW

MARIEJOSEE KING, Superintendent
Clinton Correctional Facility,
Dannemora, New York,

                    Respondent.

—————————————————

## I.      INTRODUCTION

Represented by counsel, Kirk Ashton ("Petitioner") filed a petition for a writ of

habeas corpus pursuant to 28 U.S.C. § 2254.    (Dkt. 1).    Petitioner challenges the

constitutionality of the judgment entered against him on November 23, 2022, in New York

State Supreme Court, Monroe County (Renzi, J.).[1]    Petitioner was convicted after a jury

trial of 17 counts of Course of Sexual Conduct Against a Child in the Second Degree (New

York Penal Law ("P.L.") § 130.80(1)(b)), 11 counts of Sexual Abuse in the First Degree

(P.L. § 130.65(4)), and 18 counts of Endangering the Welfare of a Child (P.L. § 260.10(1)).

———————————

[1]    Page citations to pleadings are to the pagination automatically generated by the
Court's case management and electronic filing system (CM/ECF) and located in the header
of each page.

Petitioner is presently serving an aggregate sentence of 20 years in prison.[2]  For the reasons

below, the request for a writ of habeas corpus is denied, and the petition is dismissed.

## II.     BACKGROUND

### A.     Crime and Indictment

A Monroe County grand jury returned Indictment No. 2021-0235 (SR: 164-73)[3] and

Indictment No. 2021-0356 (SR: 177-87) on April 23, 2021, and June 22, 2021,

respectively, against Petitioner.  The indictments alleged that between 2012 and 2021,

while Petitioner was the principal at Northwood Elementary School in the Town of Hilton,

he sexually abused 26 male students who attended the school.

The indictments were consolidated for Petitioner's jury trial, which commenced

before Monroe County Court Judge Alex R. Renzi ("trial court") on October 3, 2022.  At

trial, 24 of the 26 victims testified about Petitioner's inappropriate conduct towards them.

C.S.[4] was the first victim to come forward, telling his parents during spring break

of 2021 (T: 336-37)[5] that Petitioner had been sexually abusing him since the 2018-2019

---

[2]     *See* New York State Department of Corrections and Community Supervision Incarcerated Lookup, *available at* https://nysdoccslookup.doccs.ny.gov/ (search results for DIN 22B5053) (last accessed July 12, 2026).

[3]     Citations to "SR:" refer to the Bates-stamped page numbers of the state court records, filed at Docket 9-1.

[4]     The victims are referred to by their initials only, as in the state court transcripts and records.  Where two victims share the same initials, the victim who testified second at trial will have a "2" after their initials.

[5]     Citations to "T:" refer to the original pagination of the trial transcript, filed at Docket 9-2 and Docket 9-3.

school year, when C.S was in third grade (T: 323-27).  C.S. testified that Petitioner would instruct C.S.'s teachers to send him to Petitioner's office to discuss school-related matters. Petitioner would tell C.S. to sit on his lap, and Petitioner would massage C.S.'s neck, sometimes putting his hands into C.S.'s pants and underwear to fondle C.S.'s buttocks.  (T: 325, 327).  Petitioner's sexual contact with C.S. continued throughout the fourth and fifth grades.  Petitioner would put his hands into C.S.'s underwear and touch him near his "front body part," *i.e.*, his penis.  (T: 328-29).  Sometimes the sexual contact occurred after Petitioner hosted a "lunch bunch,"[6] where he would invite certain male students to eat lunch in his office; when lunch was done, Petitioner would dismiss the other boys and ask C.S. to remain.  (T: 333-34).

On March 26, 2021, C.S.'s mother spoke with Petitioner about C.S. being bullied at school; Petitioner suggested that he meet with C.S. over spring break.  (T: 371-72).  When C.S.'s mother relayed this suggestion to C.S., C.S. revealed the abuse.  (T: 336-37, 373). C.S.'s parents notified local law enforcement, and the New York State Police initiated an investigation which uncovered incidents of abuse dating back at least nine years.  (T: 374-77).

N.K., one of the earliest victims, described being called to Petitioner's office during the 2012-2013 school year, when he was in fourth grade.  N.K. had been in a fight with another student and was crying.  Petitioner put N.K. on his lap, placed his hand over N.K.'s

---

[6]    Some of the students who attended "lunch bunches" and were touched inappropriately by Petitioner observed Petitioner touching other boys at the lunch bunches in the same way.  (*See, e.g.*, T: 1503-04, 1513-15 (E.S.); T: 1571-73, 1577-80, 1584 (M.M.2)).

crotch area, and touched N.K.'s penis while whispering in N.K.'s ear.  (T: 1798-99, 1089-11).  N.K. testified about another incident when he was in sixth grade.  A close friend of his recently had died, and N.K. was "distraught."  Petitioner brought N.K. to his office to talk with him.  As N.K. spoke tearfully about his friend, Petitioner, who was sitting close to N.K., began rubbing N.K.'s head and neck, and then reached into N.K.'s shorts, put his hand directly on N.K.'s genitals and moved his hand around, and then inserted his finger into N.K.'s anus.  (T: 1801-05, 1818-20).

Twenty-two of the other boys referenced in the indictments testified at trial and recounted similar incidents of inappropriate touching by Petitioner.  Their testimony revealed that Petitioner frequently arranged time alone with his victims by having them come to his office for academic help (*see*, *e.g.*, T: 416-24 (J.K.); T: 461-64 (L.K.); T: 1125-26, 1130-34 (C.L.); T: 1220-25 (F.B.); T: 1268-77 (M.D.); T: 1085-88 (G.A.)); or to talk about stressful situations and difficulties at home (*see*, *e.g.*, TT: 1393-96 (A.D.); T: 1654-65 (A.M.)).  Sometimes Petitioner would gain time alone with a victim when a teacher would send a misbehaving student to Petitioner's office.  (*See*, *e.g.*, T: 680-86 (C.M.); T: 1032-38 (B.M.); (T: 1220-25 (F.B.)).

School employees provided evidence corroborating the victims' testimony about Petitioner's inappropriate physical contact with them.  Kelley O'Connell-Byrne, the assistant principal, observed B.M. and other students sitting on Petitioner's lap.  (T: 1848, 1852-53).  Though she viewed Petitioner's boundaries with students as "very skewed" and "not appropriate," she did not report his actions.  (T: 1866-67).  Social worker Jamie Kelsey observed children leaning against Petitioner during reading-help sessions.  (T: 550-51).  On

one occasion, she saw Petitioner with his hand around a boy's waist; when Petitioner noticed her, he immediately dropped his hand. (T: 551, 553). Teacher Jennifer Silsbee saw M.D. sitting in Petitioner's lap on March 4, 2019. (T: 825-26). She recorded the incident on her cell phone but did not share the video until after the police investigation began, citing fear of retaliation. (T: 826-29).

Custodians Joseph Abballe ("Abballe") and Shaun Castle ("Castle") testified that there were "always male students" in Petitioner's office. (T: 905-06, 924). During the week before spring break in 2021, Abballe and Castle observed Petitioner sitting next to a little boy in the cafeteria and "rubbing his back very intimately." (T: 914-15, 927). When Abballe exclaimed, "that's wrong, [he] shouldn't be doing that," Petitioner, "scrambling his words," tried to change the subject. (T: 914-15).

The prosecution's final witness was Stefan Perkowski ("Perkowski"), who was qualified as an expert witness on the topic of Child Sexual Abuse Accommodation Syndrome ("CSAAS"). (T: 7-8; SR: 314-28). Perkowski testified that he did not know anything about Petitioner's case and that CSAAS is not a diagnostic tool. (T: 1912-14). Instead, CSAAS is an educational tool used to help explain the behaviors of children who have experienced sexual abuse. (Id.). Perkowski testified that CSAAS is typified by five categories of behavior: (1) helplessness, in that the child is totally dependent on adults and is socially conditioned to obey them; (2) secrecy about the abuse, which is enforced by the abuser; (3) entrapment by the abuser and accommodation of the abuse by the child; (4) delayed disclosure of the abuse; and (5) retraction or recantation, which only occurs in "rare" cases. (T: 1914-16). Perkowksi testified that "entrapment and accommodation and

delayed disclosure follow on [from] the first two [categories of helplessness and secrecy]." (T: 1917).

Petitioner did not testify, and the defense did not call any witnesses. (T: 1953-54). With the prosecution's consent, the trial court granted Petitioner's motion for a trial order of dismissal as to three counts due to the failure of the named victims, J.G. and T.N., to testify at trial, leaving 50 counts against Petitioner for the jury to consider. (T: 1950-52).

The jury convicted Petitioner of Counts 1, 3, 5, 7, 9, 11, 13, 28, 30, 32, 34, 35, 37, 40, 42, 44, and 46 (Course of Sexual Conduct Against a Child in the Second Degree); Counts 15, 16, 17, 19, 20, 22, 23, 27, 29, 48, and 49 (Sexual Abuse in the First Degree); and Counts 2, 4, 6, 8, 10, 12, 14, 18, 21, 24, 31, 33, 36, 41, 43, 45, 47, and 50 (Endangering the Welfare of a Child). (T: 2102-10).

The jury acquitted Petitioner of Counts 25 and 39 (Endangering the Welfare of a Child); and Counts 26 and 38 (Course of Sexual Conduct Against a Child in the Second Degree). (T: 2106, 2108).

**B.    Sentence**

On November 23, 2022, the trial court sentenced Petitioner as a second felony offender (S: 3)[7] to consecutive determinate terms of three years' incarceration plus five years' post-release supervision on the convictions for Course of Sexual Conduct Against a Child in the Second Degree, determinate terms of three years' incarceration plus five years' post-release supervision on the convictions for Sexual Abuse in the First Degree, which

---

[7]    Citations to "S:" refer to the original pagination of the transcript of the sentencing hearing, filed at Docket 9-3.

were set to run concurrently with each other and consecutively to the sentences on the convictions for Course of Sexual Conduct Against a Child in the Second Degree; and definite terms of 364 days' incarceration on the eighteen convictions for Endangering the Welfare of a Child.  (S: 51-53).

### C.      Direct Appeal

Petitioner filed notices of appeal as to his convictions on both indictments, and the appeals were consolidated.  (SR: 341-42).  Petitioner filed a brief in the Appellate Division, Fourth Department, of New York State Supreme Court ("Appellate Division").  (SR: 1-63).  The prosecution filed a brief in opposition.  (SR: 64-99).  Petitioner filed a reply.  (SR: 100-20).  The Appellate Division unanimously affirmed the judgments of conviction on July 26, 2024.  (SR: 123-24 (Appeal No. 1); SR: 126 (Appeal No. 2)).

Appellate counsel filed an application for leave to appeal to the New York Court of Appeals.  (SR: 121-22).  The prosecution opposed the leave application.  (SR: 405).  The Court of Appeals denied leave on October 30, 2024.  (SR: 142).

### D.      Motion to Vacate the Judgment

On February 26, 2024, trial counsel filed a motion to vacate the judgment pursuant to New York Criminal Procedure Law ("C.P.L.") § 440.10 ("440 motion") on the grounds of juror misconduct.  At the time, Petitioner's direct appeal still was pending.  (SR: 354-55).

In support of the motion, Petitioner submitted the affidavit of S.N., who had served as a juror at his trial.  (SR: 350-52).  She stated that in her "opinion, the prosecution did not prove that having the children just sitting on [Petitioner]'s lap, or [Petitioner] rubbing

children's shoulders and/or backs, was evidence of sexual gratification," because "they never found any sort of photos or child pornography on [Petitioner']s phone or computer that would have helped prove these things were done for sexual gratification."  (SR: 350). S.N. also said she did not find Perkowski credible when he testified about "how children behave when they are being sexually 'groomed' and sexually abused" because Perkowski "admitted that he hadn't seen or treated children professionally since 2012."  (SR: 351).

S.N. also asserted that three of the jurors were from Hilton and two had children who had attended the school where Petitioner had worked, which she "found . . . odd." (SR: 352).  In addition, S.N. claimed that "an older female juror specifically said she knew that [Petitioner] was an alcoholic" and that this juror had "seen him drunk before."  (SR: 352).

S.N. stated that the "the rest of the jurors kept trying to convince [her] to vote 'guilty,' but [she] wouldn't."  (SR: 350).  Because she believed that she and the rest of the jurors had come to an impasse, S.N. asked to speak to the trial court.  (SR: 350 (referring to T: 2090-94)).[8]  However, "[t]he judge didn't listen" to any of her concerns and directed her to "go back in and continue to deliberate and do [her] duty."  (SR: 351).  S.N. also complained that she "couldn't afford to continue to be away from work, day after day,

---

[8]    Before S.N. was brought into the courtroom, the trial court noted that S.N. "[a]pparently knocked on the door, had her purse in hand, told Deputy Bellavia she was done, she wanted to talk to the Judge, she was done."  (T: 2089).  While walking down the hall past the jury room, the trial court heard S.N. "yelling at the rest of the jurors" though it was unclear what she was saying.  (T: 2089-90).

when nothing [she] heard was going to change [her] mind," but the trial court was not sympathetic.  (SR: 351).

When S.N. returned to deliberations after speaking to the trial court, "nothing changed" except that she "finally just gave in so that [she] could go back to work."  (SR: 351).  S.N. admitted that she did agree to vote guilty on the charges involving the child who claimed that Petitioner had "pinched or grabbed his buttocks in the school hallway," because the child "seemed credible" and "a teacher or principal should definitely know that grabbing or pinching a child's bottom or buttocks is not appropriate."  (SR:352).  S.N. said that her "true verdict for the remaining charges" was "not guilty."  (*Id.*).

The prosecution filed an affirmation in opposition (SR: 353-61), arguing that the bulk of S.N.'s affidavit was an impermissible attempt to impeach the verdict.  The prosecution also debunked S.N.'s factual assertions about the jurors living who she claimed lived in Hilton, had children who attended the school at which Petitioner had worked, and had personal relationships with Petitioner.  The prosecution further argued that S.N.'s statements recounting comments by the older female juror about Petitioner's alleged alcoholism were hearsay and insufficient to support a claim of juror misconduct.

In a written decision and order dated July 15, 2024, the trial court denied the 440 motion without a hearing (SR: 362-65), largely for the reasons argued in the prosecution's opposition papers.  Petitioner applied for leave to appeal (SR: 366-98), which the prosecution opposed (SR: 399-414).  The Appellate Division denied the leave application on October 10, 2024.  (SR: 415-16).

###### E.     Federal Habeas Proceeding

Petitioner timely filed his counseled petition (Dkt. 1), raising two grounds for relief, and a memorandum of law in support (Dkt. 1-1).  First, Petitioner claims that he was denied his right to a jury trial and to have only qualified, competent, impartial jurors render a verdict because the trial court failed to discharge, or conduct further inquiry of, a juror who had been observed sleeping during a readback of testimony.  (Dkt. 1 at 4).  Second, Petitioner asserts that trial counsel was ineffective because he failed to object to prejudicial, non-probative testimony from the CSAAS expert about how teachers and principals can groom children to be sexually abused.  (*Id.* at 4-5).  In the section of his memorandum of law regarding the ineffectiveness claim Petitioner mentions juror S.N.'s affidavit and asserts that it demonstrates the prejudicial effect of the grooming testimony.  (*Id.* at 25).

Respondent filed a response (Dkt. 9), memorandum of law in opposition (Dkt. 10), and the state court records (Dkt. 9-1) and transcripts (Dkt. 9-2; Dkt. 9-3).  Respondent argues that Petitioner's argument based on S.N.'s affidavit renders the ineffectiveness claim unexhausted because, when he raised the ineffectiveness claim on direct appeal, he did not include the affidavit.  (Dkt. 10 at 32-33).  Respondent contends that the ineffectiveness claim is plainly meritless, as are the remaining claims in the petition, such that dismissal of the mixed petition is warranted under 28 U.S.C. § 2254(b)(2).

Petitioner filed a reply.  (Dkt. 11).  Among other things, Petitioner states that to the extent S.N.'s affidavit renders the ineffectiveness claim unexhausted, he wishes to withdraw any reference to the affidavit.  (*Id.* at 10).

- 10 -

## III.    STANDARD OF REVIEW

"The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)." *Harrington v. Richter*, 562 U.S. 86, 97 (2011) ("*Richter*"). AEDPA articulates a "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (citation and internal quotation marks omitted). "[W]hen it is unclear whether AEDPA deference applies," the Supreme Court has stated that courts may "deny writs of habeas corpus under § 2254 by engaging in *de novo* review because a habeas petitioner will not be entitled to a writ of habeas corpus if his or her claim is rejected on *de novo* review." *Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010). Here, because Petitioner's claims do not warrant habeas relief even under a *de novo* standard, the Court need not determine whether the claims were "adjudicated on the merits" for purposes of § 2254(d).

## IV.    DISCUSSION

### A.    Sleeping Juror Claim

#### 1.    Relevant Factual Background

During deliberations, the jury requested a readback of the testimony provided by L.K. and L.K.'s mother, as well as the portion of Jennifer Silsbee's testimony relating to L.K. (T: 2085). The court reporter read back the requested testimony to the jurors. (T: 2085-86).

- 11 -

After the jury left the courtroom to return to their deliberations, trial counsel announced that he wished to speak to the trial court about a juror who appeared to be asleep during the readback. (T: 2087). The following exchange occurred between trial counsel and the trial court:

MR. HOUSEL: Can I be heard on the one juror that you, in my view, had to wake up during the readbacks? I have some notes as to my observations.

THE COURT: I made the same observations. Her head was nodding a few times. I was watching pretty carefully. When I coughed, she woke up. She started to nod again. But, it's not during the trial. So, it doesn't make her grossly unqualified, but I noted it too. But then when I stopped, stopped the court reporter, from that point on she never nodded again.

MR. HOUSEL: My notes, my observations began were [sic] at 1:49, and I did alert security. Before alerting the deputy she appeared to be clearly asleep. That's why I notified them, and then she continued to head bob and, at times, appeared to be sleeping.

THE COURT: She bobbed a couple times.

MR. HOUSEL: I sent a text message to Ms. Vanstrydonck[, the prosecutor,] who coughed loudly shortly after my text, and she did not budge. And then after that for about, I don't know, eight, nine minutes, she kept closing her eyes, but she would move around and wake back up, and she appeared to fall asleep again. I notified the deputy when, this time, she was definitely asleep, and [Y]our Honor woke her up, and it appears she slept through a majority of the read back.

THE COURT: Not the majority of the readback. That's an exaggeration. I was watching her. There was [sic] times she dropped her head, but I don't think she ever made it into the [sic] REM sleep. Your exception is noted. That doesn't make her grossly unqualified during the readback. If that happened during the trial, I would examine her much more closely.

MR. HOUSEL: Note my exception.

(T: 2087-88).

- 12 -

When Petitioner raised this claim on direct appeal, he principally argued that the trial court erroneously failed to comply with C.P.L. § 270.35(1) by conducting a further inquiry of the sleeping juror or discharging the juror as grossly unqualified. Petitioner also asserted that the trial court's failure to discharge the juror "deprived [him] of his constitutional rights to be tried by a jury of 12 qualified jurors (NY Const[.] art. VI, § 18) and to a fair trial and to an impartial jury under the Federal and State Constitutions (*see*, NY Const., art. I, §§ 2 and 6; US Const. 6th, 14th Amends)." (SR: 28).

### 2. The Appellate Division's Ruling

The Appellate Division rejected Petitioner's contention based on C.P.L. § 270.35(1), noting that "[a] determination whether a juror is unavailable or grossly unqualified, and subsequently to discharge such a juror, is left to the broad discretion of the court." *People v. Ashton*, 229 A.D.3d 1322, 1323 (4th Dep't 2024) (internal quotation marks and citation omitted). The Appellate Division observed that:

> defense counsel brought to the court's attention that, during the readback of testimony, he observed a juror who had to be woken by the court. The court stated that it was watching "pretty carefully" and observed the juror's head nodding a few times. The court stopped the court reporter during the readback and, after that point, the juror never nodded again. The court also noted for the record that the juror heard the same testimony during the trial.

*Id.* The Appellate Division determined that "further inquiry [of the juror] was not required" under C.P.L. § 270.35(1) because the trial court "had the benefit of its own observations." *Id.* Therefore, the trial court "did not abuse its discretion in not disqualifying the juror." *Id.* (internal quotation marks and citation omitted). The Appellate Division did not discuss Petitioner's allegations based on the New York State Constitution or the U.S. Constitution.

### 3.    The Claim Based on C.P.L. § 270.35(1) Is Not Cognizable

To the extent Petitioner argues that the trial court violated C.P.L. § 270.35(1) by failing to discharge or make further inquiry of the juror who slept during a portion of the readback of certain testimony, that claim is not cognizable on habeas review.  C.P.L § 270.35(1) provides in relevant part that:

> [i]f at any time after the trial jury has been sworn and before the rendition of its verdict, . . . the court finds, from facts unknown at the time of the selection of the jury, that a juror is grossly unqualified to serve in the case or has engaged in misconduct of a substantial nature, but not warranting the declaration of a mistrial, the court must discharge such juror.

C.P.L. § 270.35(1).

In *People v. Buford*, 69 N.Y.2d 290, 298 (1987), the New York Court of Appeals "set forth a framework for trial courts to determine, pursuant to CPL [§ ]270.35(1), whether a sworn juror must be discharged as grossly unqualified to serve due to facts unknown at the time of selection or where the juror has engaged in misconduct of a substantial nature." *People v. Batticks*, 35 N.Y.3d 561, 565 (2020).  In defining the term "grossly unqualified" for purposes of the statute, the New York Court of Appeals relied solely on its own precedents and not federal constitutional law.  *See*, *e.g.*, *People v. Rodriguez*, 71 N.Y.2d 214, 219 (1988) (discussing *Buford*'s holding and definition of "grossly unqualified").  According to *Buford*, "[w]hen 'presented with some credible information indicating that a sworn juror may be grossly unqualified, [a court] must conduct a probing and tactful inquiry of the juror.'" *People v. Wiggins*, No. 99, 2025 WL 3272349, at *2 (N.Y. Nov. 25, 2025) (internal quotation marks and citation omitted in original) (quoting *People v. Kuzdzal*, 31 N.Y.3d 478, 486 (2018)).  Such inquiries are not invariably required, such

- 14 -

when the trial judge personally is able to observe the juror in question and the circumstances alleged to be evidence of misconduct or disqualification. *See*, *e.g.*, *Batticks*, 35 N.Y.3d at 563 (holding that because "the entire incident unfolded in open court, a *Buford* inquiry of the juror was unnecessary, as the court was able to adequately assess that her outburst was not a transformative one and her sworn oath to be impartial remained intact").

As the Supreme Court has emphasized repeatedly, it is "not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). Because federal habeas review is "is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States," *id.* at 68 (citing 28 U.S.C. § 2254(a)), "a state prisoner could never bring a pure statutory-error claim in federal habeas," *Jones v. Hendrix*, 599 U.S. 465, 490 (2023).

The allegation that the trial court failed to comply with C.P.L. § 270.35(1) by making further inquiry of, or discharging the juror who was observed sleeping during a readback presents only a question of New York State law and does not set forth a question of federal constitutional magnitude. Accordingly, it is dismissed on that basis. *See Hubert v. Miller*, No. 22-CV-4565 (BMC), 2023 WL 2071290, at *6 (E.D.N.Y. Feb. 17, 2023) ("A dispute over whether a juror is 'grossly unqualified' under N.Y. C.P.L. § 270.35(1) is a matter of New York State law, not federal law, and that is not the standard under the United States Constitution, nor in any Supreme Court decision."); *Newmark v. Keyser*, No. 19-CV-3611 (BMC), 2020 WL 4719914, at *2 (E.D.N.Y. Aug. 13, 2020) (holding that to the extent the petitioner was seeking review of the intermediate appellate court's "disposition

- 15 -

of his C.P.L. § 270.35 claim, that request is not within the scope of habeas corpus review")
(collecting cases).

#### 4.    The Federal Constitutional Claim Is Meritless

Petitioner asserts that the trial court's failure to discharge, or make further inquiry of, the juror observed sleeping during a readback of testimony violated his Sixth and Fourteenth Amendment "rights to a fair jury trial and to have only impartial, qualified, competent jurors render a verdict." (Dkt. 1-1 at 14 (citing *Tanner v. United States*, 483 U.S. 107, 126-27 (1987); *Irvin v. Dowd*, 366 U.S. 717, 721-22 (1961)). Petitioner's memorandum of law in support of this claim largely repeats the arguments he made on direct appeal based on C.P.L. § 270.35(1) and New York State caselaw interpreting that statute. In any event, neither *Irvin* nor *Tanner* assist him in showing that his constitutional rights were violated by the juror who slept during a portion of a readback of testimony.

In *Irvin*, the primary question before the Supreme Court was whether the jury that tried the petitioner was sufficiently impartial or whether it had been prejudicially tainted by negative pre-trial publicity. *See Irvin*, 366 U.S. at 727-28; *Irvin v. Dowd*, Petitioner's Brief, 1960 WL 98622, at *2 (U.S. 2006). The Supreme Court observed that the constitutional right to a jury trial entails "a fair trial by a panel of impartial, 'indifferent' jurors." *Id.* at 722. And "[t]he failure to accord an accused a fair hearing violates even the minimal standards of due process." *Id.* However, jurors are not expected to be devoid "of any preconceived notion as to the guilt or innocence of an accused." *Id.* at 723. For due process purposes, it is "sufficient" if the jurors "can lay aside" their opinions and "render a verdict based on the evidence presented in court." *Id.* But "[t]he adoption of such a rule

- 16 -

. . . cannot foreclose inquiry as to whether, in a given case, the application of that rule works a deprivation of the prisoner's life or liberty without due process of law." *Id.* (quotation omitted).

After conducting such an inquiry, the Supreme Court found "clear and convincing" evidence of "deep and bitter prejudice" against the [p]etitioner in the community; such prejudice was reflected in the jurors' *voir dire* responses. For instance, even though the jurors said they would be "fair and impartial" to the petitioner, those statements were entitled to "little weight" where "[t]wo-thirds of the jurors had an opinion that [the] petitioner was guilty and were familiar with the material facts and circumstances involved, including the fact that other murders were attributed to him, some going so far as to say that it would take evidence to overcome their belief." *Irvin*, 366 U.S. at 728. *Irvin* thus has little to no relevance to Petitioner's sleeping-juror claim, given that he has never alleged that the juror who slept during the readback was not impartial or was biased in favor of the prosecution.[9]

*Tanner* did involve allegations of juror misconduct and inattentiveness, but it is not helpful to Petitioner. There, one of the defendants moved for a new trial based on his attorney's post-verdict receipt of an unsolicited telephone call from one of the trial jurors stating that several of the jurors consumed alcohol while on lunch breaks, causing them to sleep through the afternoons. *Tanner*, 483 U.S. at 113. After the district court denied the

---

[9]     The jury acquitted Petitioner of one of the four charges involving L.K., who was the subject of the readback, namely, Count 25 (Endangering the Welfare of a Child between January 1, 2021, and March 26, 2021). (*See* T: 2106; SR: 172-73).

- 17 -

motion for a new trial, and while the case was on appeal, the attorney received an unsolicited communication from another juror, Hardy, who said that he and other jurors consumed multiple alcoholic drinks and took drugs (including marijuana and cocaine) while on lunch breaks during the trial, that a juror sold marijuana to another juror, and that jurors were falling asleep during the afternoon sessions of trial. *Id.* at 115-16.

At the evidentiary hearing on the motion for a new trial, the judge relied on Federal Rule of Evidence ("F.R.E.") 606(b)[10] to preclude evidence of the jurors' alcohol and drug consumption and inattentiveness. 483 U.S. at 121-22. The Supreme Court found that this ruling was not an abuse of discretion. Noting that F.R.E. 606(b) would not necessarily bar juror testimony concerning external influences upon juror conduct, *id.* at 117 (collecting cases), the Supreme Court observed that "lower federal courts [have] treated allegations of the physical or mental incompetence of a juror as 'internal' rather than 'external' matters," *id.* at 118. The Supreme Court determined that allowing evidence of "external" matters while precluding evidence of "internal" matters reflected a prudent policy choice due to "the necessity of shielding jury deliberations from public scrutiny." *Id.* at 119.

The Supreme Court recognized the existence of a common-law exception allowing a trial judge to conduct a post-verdict inquiry of the jurors' competence "in cases of 'substantial if not wholly conclusive evidence of incompetency,'" *id.* at 125 (quoting

---

[10]    F.R.E. 606(b) provides that when inquiring into the validity of a verdict or an indictment, a trial judge may not receive a juror's testimony or affidavit about "any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment." F.R.E. 606(b)(1).

*United States v. Dioguardi*, 492 F.2d 70, 80 (2d Cir. 1974)).  Even assuming F.R.E. 606(b) retained that exception, the allegations of incompetence by juror Hardy were too "meager"[11] to allow a post-verdict inquiry under the common law exception.  *Id.* at 126.

The defendant in *Tanner* fared no better with his argument that the trial judge's "refusal to hold an additional evidentiary hearing at which jurors would testify as to their conduct 'violate[d] the sixth amendment's guarantee to a fair trial before an impartial and *competent* jury.'"  *Id.* at 126 (emphasis in original) (citation to record omitted).  The Supreme Court rejected the notion that "the Constitution compelled the [trial judge] to hold an additional evidentiary hearing including one particular kind of evidence inadmissible under the Federal Rules."  *Id.*  Instead, the defendant's "Sixth Amendment interests in an unimpaired jury . . . [were] protected by several aspects of the trial process," including the parties' ability to examine the jurors' suitability for service during *voir dire*; the ability of the judge, attorneys, and court personnel to observe the jury during trial; the jurors' ability to observe each other and report inappropriate juror behavior to the court; and the ability of the parties' to impeach a verdict by proffering nonjuror evidence of misconduct.  *Id.* (collecting cases).  *Tanner* thus did not hold that jurors falling asleep during trial is evidence of incompetence or impairment for purpose of establishing a constitutional violation.  Indeed, *Tanner* suggests the opposite.

---

[11]    Hardy stated that he and the three other jurors he drank with at lunchtime never became intoxicated despite their alcohol consumption.  *Tanner*, 483 U.S. at 126.  Hardy observed "some" jurors "falling asleep all the time" during trial and said that "his own reasoning ability was affected on one day of the trial."  *Id.*

The circuit court cases cited by Petitioner (Dkt. 1-1 at 14) similarly do not aid his cause. As Petitioner recognizes, these cases uniformly hold that "a court is not invariably required to remove sleeping jurors," *Freitag*, 230 F.3d at 1023 (citing *United States v. Springfield*, 829 F.2d 860, 864 (9th Cir. 1987), *abrogated on other grounds by United States v. Benally*, 843 F.3d 350, 353-54 (9th Cir. 2016)), "and a court has considerable discretion in deciding how to handle a sleeping juror," *id.* (citing *United States v. Wilcox*, 50 F.3d 600, 603 (8th Cir. 1995)); *accord McKeighan*, 685 F.3d at 973.

"As a general rule, juror misconduct, such as inattentiveness or sleeping, does not warrant a new trial absent a showing of prejudice—*i.e.*, that the defendant did not receive a fair trial." *McKeighan*, 685 F.3d at 973-74 (citing *United States v. Lawrence*, 405 F.3d 888, 903 (10th Cir. 2005); *United States v. Fernández-Hernández*, 652 F.3d 56, 75 (1st Cir. 2011) ("A sleeping juror does not violate a defendant's due process rights unless the defendant can show he was prejudiced to the extent that he did not receive a fair trial."); *Springfield*, 829 F.2d at 864 (referring to sleeping as "juror misconduct" and requiring a demonstration that the defendant was "deprived . . . of his right to an impartial jury and, more generally, to a fair trial")); *see also United States v. Sherrill*, 388 F.3d 535, 537 (6th Cir. 2004) ("Sherrill has provided no evidence—indeed, he makes only a vague assertion—that the juror was in fact sleeping, and that such behavior had a prejudicial effect on his defense." (citing *United States v. Newman*, 982 F.2d 665, 670 (1st Cir. 1993) (holding that a party claiming juror misconduct due to "inattention" cannot merely allege the purported conduct but must affirmatively establish the juror's inattention, and the resolution of any disputed issue of fact rests within the discretion of the trial judge)).

- 20 -

Though Petitioner acknowledges the necessity of showing prejudice (Dkt. 1-1 at 13), he suggests that doing so is impossible due to the trial court's failure to conduct a further inquiry of the juror under C.P.L. § 270.35(1). (*See id.* at 15 (noting that the trial court "refused to conduct an inquiry because the readback of witness testimony was not 'during the trial', thus improperly preventing a determination of the extent and nature of the prejudicial impact of the sleeping juror")). However, as discussed above, C.P.L. § 270.35(1) does not necessarily mandate an inquiry of the juror if the trial judge is able to observe and assess the juror in question, as was the case here. *See Batticks*, 35 N.Y.3d at 565. As a matter of federal law, it is incumbent on Petitioner to show affirmatively that his constitutional rights were prejudiced by the juror who slept during a portion of the readback. *See Epps v. Poole*, 687 F.3d 46, 50 (2d Cir. 2012) (stating that the applicant for a writ of habeas corpus "bears the ultimate burden of proving by a preponderance of the evidence that his [federal] constitutional rights have been violated").

When determining if the presence of a sleeping juror prejudiced a defendant's right to fair trial, federal courts "may consider whether 'the sleeping juror missed large portions of the trial or [whether] the portions missed were particularly critical.'" *McKeighan*, 685 F.3d at 974 (quoting *Freitag*, 230 F.3d at 1023; citing *United States v. Barrett*, 703 F.2d 1076, 1083 n.13 (9th Cir. 1983)). In addition, courts "may review the record to determine whether the [trial] court was made aware of sleeping jurors, whether the court took action, and whether the record establishes that jurors were actually sleeping." *Id.* (citing, *inter alia*, *Freitag*, 230 F.3d at 1024 ("We find no abuse of discretion by the district judge,

especially since she had not noticed an extensive sleeping problem and she admonished counsel on both sides to alert her to any further sleeping episodes.")).

Here, although trial counsel asserted that the juror slept through the "majority" of the readback, the trial court deemed that an "exaggeration." (T: 2087-88). But even accepting trial counsel's version of events as true, Petitioner has never argued, and there is no suggestion in the record, that the juror slept during any other part of the trial, *e.g.,* witness testimony, other readbacks of testimony, the trial court's jury charges, or jury deliberations. Similarly, there is no evidence, and Petitioner has never argued, that the juror in fact missed any portions of the actual trial testimony that was the subject of the readback.

Petitioner's assertion that if a juror sleeps during a readback of trial testimony, he or she "is not able to meaningfully participate in the post-readback discussions of the testimony, even if that juror, like the other jurors heard the original testimony," is speculative and unsupported by any evidence. It bears nothing that S.N., the juror who submitted the affidavit in support of Petitioner's juror misconduct claim in the 440 motion, did not mention any issues with any jurors sleeping or being inattentive during any part of the trial or jury deliberations. Furthermore, neither the attorneys nor the trial court noted any additional instances of the juror falling asleep or appearing drowsy or inattentive.

Petitioner has not shown that his right to a fair trial or an impartial, competent jury was prejudiced in any way based on the trial court's failure to conduct a further inquiry of, or discharge, the juror who was observed sleeping during a portion of a readback of testimony. Therefore, habeas relief is not warranted on this claim. *See*, *e.g.*, *United States*

- 22 -

*v. Steele*, 390 F. App'x 6, 14 (2d Cir. 2010) (upholding a trial court's determination not to remove a sleeping juror where the trial judge declined to discharge a juror for sleeping "unless they were sleeping through the entire evidence"); *United States v. Hui*, 64 F. App'x 264, 266 (2d Cir. 2003) (finding "no question" that the trial judge "acted well within its discretion in refusing to dismiss" a sleeping juror; after learning of juror "nodding off," the trial judge "appropriately spoke to the juror in private about the need to pay attention," "did not agree with defense counsel's assertion that the juror had been sleeping during the second day of trial," and stated that it was "pleasantly surprised" with the attention the juror had been paying); *United States v. Tierney*, 947 F.2d 854, 869 (8th Cir. 1991) (where "some of the jurors slept and read magazines during the trial," finding that "the jury's inattentiveness was not sufficient prejudicial to require a mistrial" because the defendant had "not shown that the jury ignored any particularly important items"); *United States v. McFerren*, 142 F.3d 437, 1998 WL 180514, at *6 (6th Cir. 1998) (stating that although it "appear[ed] that a couple of the jurors had trouble staying awake at certain times," "both the attorneys and the judge kept a watchful eye on the jury" and "[w]hen necessary, the judge admonished the jury to stay awake"; finding that "the fact that jurors seemed sleepy at times and fell asleep at others amounts to such a serious problem that would deny [the defendant] a right to due process").

### B.    Ineffective Assistance of Trial Counsel

#### 1.    Relevant Factual Background

Petitioner asserts that trial counsel was ineffective for failing to object to Perkowski's testimony about "grooming" behavior on the basis that grooming is not part

of CSAAS and therefore was outside the scope of the trial court's ruling.  Petitioner also claims that trial counsel was ineffective for eliciting an example of grooming behavior from an unrelated case when he cross-examined Perkowski.

The testimony challenged by Petitioner was offered in response to the prosecutor asking Perkowski to elaborate on the "helplessness" and "secrecy" aspects of CSAAS.  (T: 1917-19, 1921-22).  Perkowski testified that sexual abusers build trust in their child victims, which fosters compliance with the sexual abusers' demands.  (T: 1918-20).  The establishment of trust involves a "slow, build-up process" through "[a]ll kinds of ways to ingratiate [one]self with the child," such as "touching," "stroking," or "praising" the child.  (T: 1919).  Perkowski testified that through this process, the sexual abuser "gain[s] the child's trust" so the child will "becom[e] compliant" with the "more flagrant sexual activity" that comes later.  (T: 1919).  When asked if there was a "term that relates" to the "process and the build-up," Perkowski responded that there are two—one is "grooming," meaning, "[h]ow do you get a person to do what you want them to do but you don't tell them what your true intent is"; and "the other term is becoming a compliant victim" which, from the offender's viewpoint, is that "you want them to do what you want to happen to happen, and you condition them along the process or groom them along the process."  (T: 1919-20).

When asked about how "secrecy" is developed, Perkowski explained that it is a "slow," "progressive" process and relies on a "subtle intimidation."  (T: 1921-22).  For instance, the offender will tell the victim, "Gee, if you say something, your mom will get upset, and we will lose our special time."  (T: 1922).  In addition, offenders leverage the

way that parents transfer their authority over the child to other adults in the child's life and society more broadly, including nuns, priests, ministers, police officers, scout leaders, youth ministers, and parents' significant others. (T: 1922-23).

The prosecutor later asked Perkowski whether, in his experience, it was "possible for grooming behaviors to take place in front of other adults?" (T: 1931-32). Perkowski responded:

> Yes. In fact, it's very, very common. So, the offender will praise the youngster or run interference for the youngster with the adults around them if the youngster does something so it looks as though this is a nice person, they are taking the side of the kid. The adults don't know why he is doing that. It just looks like he is doing a nice thing for the kid. The kids will like that, and they will comply more with that person. So, these positive behaviors, the offenders can actually groom the adults in the environment.
>
> I had a case where the teacher was invited to kid's birthday parties in the summer, pool parties. Why? This would go on year and [sic] year. The families loved him. They would try and get the kids into his class until everybody found out what he was doing extracurricular.

(T: 1932). The prosecutor ended her direct examination at that point.

Trial counsel began his cross-examination of Perkowski as follows:

> Q:    And you said, until it was—you said when you were discussing the pool parties, the parents all loved it until the extracurricular was discovered?
>
> A.    Correct.
>
> Q.    What was the extracurricular?
>
> A.    He was grooming kids to have special time with himself. He was actually fondling some of the kids in the pool, but he was doing it through tickling. It sounded nice until other things were learned.

(T: 1933). Trial counsel then moved on to another area of questioning.

## 2. The Appellate Division's Ruling

On direct appeal, Petitioner raised two arguments related to Perkowski's testimony. Petitioner raised a standalone claim that the trial court erroneously allowed Perkowski to testify about grooming. Petitioner argued that grooming was not part of CSAAS and was outside the scope of the pre-trial ruling allowing Perkowski to testify as an expert.

Petitioner also asserted that Perkowski's explanation about how abusers can groom children in front of other adults and children, and the examples of grooming behaviors Perkowski provided, violated New York State case law because the testimony was tailored to the specific facts regarding Petitioner's conduct in this case. (SR: 32-46). Petitioner noted that "there was no dispute that [he] openly would touch the hair, neck and shoulders of male students in front of teachers, staff, and other students." (SR: 32). For instance, teacher Laurel Donaghue ("Donaghue") testified that Petitioner came into her classroom "quite a bit, [and would] walk around, see how the kids are doing, look at their papers, tousle their hair; rub their back, put [his] hand on their shoulder, just check in." (T: 1174). Donaghue saw Petitioner engage in the same conduct with male students in the cafeteria; he "would ruffle their hair, touch their back, touch their shoulders." (T: 1175). Donaghue also "had seen him a couple of times walking down the hall with a little boy holding his hand." (*Id.*). Donaghue only saw Petitioner interacting with the male students this way. (T: 1174-75).

Although the claim was unpreserved due to the lack of a timely objection, the Appellate Division nevertheless considered it on the merits. *Ashton*, 229 A.D.3d at 1323. The Appellate Division noted that as a matter of New York State law, expert testimony

concerning CSAAS "is admissible to explain the behavior of child sex abuse victims as long as it is general in nature and does not constitute an opinion that a particular alleged victim is credible or that the charged crimes in fact occurred." *Id.* at 1324. The Appellate Division found that Perkowski's "generalized testimony regarding grooming and the principal-student relationship, which provided further context and support for his explanation of CSAAS that child victims exhibit secrecy and helplessness, did not exceed permissible bounds." *Id.* Therefore, the challenge to Perkowski's testimony was "without merit." *Id.* at 1323.

As for Petitioner's claim that trial counsel was ineffective for failing to object to Perkowski's testimony about grooming and for eliciting allegedly prejudicial information about an incident of grooming in an unrelated case, the Appellate Division summarily rejected it. *See id.* at 1324 (stating that "none" of "defendant's remaining contentions . . . warrants reversal or modification of the judgments").

### 3. Legal Standard

To fulfill the two-part test in *Strickland v. Washington*, 466 U.S. 668 (1984), a defendant must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. "Second, the defendant must show that the deficient performance prejudiced the defense." *Id.* This "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. A defendant's failure to meet both prongs of the *Strickland* standard is fatal to his

ineffectiveness claim.  *See* 466 U.S. at 697 ("[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one.").

### 4.    S.N.'s Affidavit and Exhaustion

Respondent argues that Petitioner has improperly relied on S.N.'s affidavit regarding juror misconduct to show that he was prejudiced by trial counsel's failure to object to the grooming testimony.  According to Respondent, Petitioner's citation of S.N.'s affidavit renders the ineffectiveness claim unexhausted because the affidavit was not submitted to the Appellate Division on direct appeal, which was the only venue in which Petitioner raised his ineffectiveness claim.  (Dkt. 10 at 33).

Respondent is correct that "in order to have fairly presented his federal claim . . . the petitioner must have . . . set forth in state court all of the essential factual allegations asserted in his federal petition; if material factual allegations were omitted, the state court has not had a fair opportunity to rule on the claim." *Daye v. Attorney Gen. of State of N.Y.*, 696 F.2d 186, 191 (2d Cir. 1982); *see, e.g.*, *Caballero v. Keane*, 42 F.3d 738, 741 (2d Cir. 1994) (finding that new allegations of attorney's drug use and its effect on attorney's performance were not "merely supplemental" to claim of ineffective assistance); *Bravo v. Unger*, No. 10 CV 5659 VB, 2014 WL 201472, at *3 (S.D.N.Y. Jan. 16, 2014) (finding that petitioner "failed fairly to present to the state courts the specific ineffective assistance of counsel claim in [the] petition," that "counsel misadvised [the petitioner] concerning his sentencing exposure," because "neither [of the ineffectiveness claims raised in state court] relied on the specific material allegation that petitioner's trial attorney had told him he was

facing a 120-year sentence").  However, "[a] claim will not be found unexhausted 'when evidence presented for the first time in a habeas proceeding supplements, but does not fundamentally alter, the claim presented to the state courts.'" *Love v. Martuscello*, No. 17-CV-6244L, 2022 WL 2109244, at *16 (W.D.N.Y. June 10, 2022) (quoting *Caballero*, 42 F.3d at 741).

As an initial matter, the Court notes that S.N.'s affidavit is mentioned only once in Petitioner's habeas brief, in support of an argument that the *trial court's* "error in admitting Mr. Perkowski's testimony was prejudicial." (Dkt. 1-1 at 25).  Petitioner has not reasserted the claim, raised on direct appeal, that the trial court erroneously allowed Perkowski to testify outside the scope of the pre-trial ruling.

In any event, the Court is not convinced that S.N.'s affidavit "fundamentally alters" the ineffective assistance claim presented to the Appellate Division on direct appeal—that trial counsel failed to object to Perkowski's testimony about grooming behavior and then elicited testimony during Perkowski's cross-examination concerning an example of grooming behavior in an unrelated case.  S.N.'s affidavit does not supplement any of the allegations concerning trial counsel's performance; indeed, S.N. did not refer to trial counsel at all.

Moreover, the relevance of S.N.'s affidavit to Petitioner's ineffectiveness claim is not apparent.  While Petitioner claims that Perkowski's testimony about grooming helped the prosecution prove that Petitioner's actions were done for sexual gratification, S.N. rejected that notion, stating:

> In my mind, in my opinion, the prosecution did not prove that having the children just sitting on Ashton's lap, or Ashton rubbing children's shoulders and/or backs, was evidence of sexual gratification.

(SR: 350).  S.N. was skeptical towards the victims who revealed Petitioner's conduct to their parents since "none of those parents ever raised a single alarm or had an issue with what they heard."  (SR: 351).  S.N. questioned how she was "going to be convinced that what [Petitioner] was doing was wrong" "if the parents of these children didn't think anything was wrong with how [he] was treating them."  (*Id.*).  Finally, S.N. rejected Perkowski as "not a credible witness," questioning how she could treat him as an "expert" in the behavior of sexually abused children given that he had not seen children professionally in over 10 years.  (*Id.*).  S.N.'s affidavit, which rejected Perkowski's credibility and the relevance of his testimony about grooming, does not assist Petitioner in showing that trial counsel's failure to object to that testimony had any effect on the outcome of his trial.

### 5.    Counsel's Alleged Errors

#### a.    Failure to Object

"[D]ecisions such as when to object and on what grounds are primarily matters of 'trial strategy and tactics,'" *United States v. Cohen*, 427 F.3d 164, 170 (2d Cir. 2005) (quoting *Brown v. Artuz*, 124 F.3d 73, 77 (2d Cir. 1997) (internal quotation marks omitted in original)), "and thus are 'virtually unchallengeable' absent exceptional grounds for doing so," *id.* (quoting *United States v. Gaskin*, 364 F.3d 438, 468 (2d Cir. 2004) (internal quotation marks omitted in original)).  Because the testimony was not improper as a matter of New York State law as determined by the Appellate Division, Petitioner cannot show

- 30 -

"exceptional grounds" for overcoming the presumption that trial counsel made a reasonable strategic decision to decline to lodge an objection.

Further, Petitioner cannot demonstrate that he was prejudiced by trial counsel's failure to object to portions of Perkowski's CSAAS testimony because the Appellate Division analyzed the propriety of the testimony in question, notwithstanding the lack of preservation. *See*, *e.g.*, *Rodriguez v. Smith*, No. 13-CV-2522 ERK, 2015 WL 4429333, at *2 (E.D.N.Y. July 20, 2015) ("Even assuming that [the] petitioner's trial counsel was ineffective, because the Appellate Division ruled that the objection lacked merit, [the] petitioner has failed to demonstrate prejudice." (citing *Harrington v. United States*, 689 F.3d 124, 130 (2d Cir. 2012) ("At the second step of [the *Strickland*] analysis, a petitioner cannot show prejudice if the claim or objection that an attorney failed to pursue lacks merit." (citing *Aparicio v. Artuz*, 269 F.3d 78, 99 n.10 (2d Cir. 2001))))); *Lawrence v. Graham*, No. 1:12-CV-0814 MAT, 2014 WL 585301, at *11 (W.D.N.Y. Feb. 13, 2014) (same).

### b.    Eliciting Prejudicial Testimony on Cross-Examination

Petitioner contends that trial counsel "heightened the prejudicial impact" of Perkowski's testimony about grooming behavior "by starting his cross-examination by eliciting testimony . . . as to the details of an example of a teacher grooming children before their unwitting parents," *i.e.*, an unrelated case in which the abuser, a teacher, was grooming his victims at pool parties hosted by the victims' parents.

"Decisions whether to engage in cross-examination, and if so to what extent and in what manner, are . . . strategic in nature," *United States v. Nersesian*, 824 F.2d 1294, 1321

(2d Cir. 1987), and generally "will not constitute a basis for an ineffective assistance claim," *id.* Contrary to Petitioner's assertion that there was no legitimate strategic reason for asking the follow-up question to Perkowski, trial counsel reasonably could have found that Perkowski's use of the term "extracurricular" was ambiguous in that context. Trial counsel reasonably could have decided that seeking clarification did not entail any significant downside, particularly because the anecdote involved an unrelated case. Furthermore, Petitioner has never explained how this incident from an unrelated case involving dissimilar factual allegations resulted in actual prejudice to his defense. Because Petitioner has not established either deficient performance or prejudice, this allegation against trial counsel likewise fails under *Strickland*.

## V.   CONCLUSION

For the reasons above, the petition (Dkt. 1) is denied. The Court declines to issue a certificate of appealability under 28 U.S.C. § 2253(c)(1) because Petitioner has failed to make "a substantial showing of the denial of a constitutional right," *id.* § 2253(c)(2). The Clerk of Court is directed to close this case.

SO ORDERED.

ELIZABETH A. WOLFORD
Chief Judge
United States District Court

Dated:      July 13, 2026
            Rochester, New York